IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DAVID D. GLEASON, SR.,[1]

      Plaintiff,

v.                                   CIV 02-1409 KBM

JO ANNE B. BARNHART,
Commissioner of Social Security,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff David Gleason has been an insulin-dependent, Type I diabetic since his thirties. He has a tenth grade education and has worked as a carpenter.  *See e.g., Administrative Record ("Record")* at 34, 37, 177.  He applied for benefits in April 1997 alleging a disability onset date of February 1, 1990.  *Id.* at 115.  The Administration awarded him Supplemental Security Income benefits as of April 1997.  *See id.* at 45-46.  However, the date of his last insured status for Title II disability benefits was March 1994, and the Administration ultimately denied Plaintiff Title II benefits for the closed period of alleged disability.  *See id.* 46, 61-62.

The Appeals Council remanded Administrative Law Judge (ALJ) Carol A. O'Connor's first decision denying disability benefits for further findings.  *See id.* at 82-86, 113-14.  On remand, she held another hearing and issued another decision.  The result of her second decision is the same as her first opinion – that during the relevant period Plaintiff had the capacity to

---

[1]  Some of the pleadings mistakenly refer to Plaintiff as "Jr.," rather than "Sr."

engage in light work and was not disabled under the Medical Vocational Rules or "Grids." *See id.* at 17-22. After reviewing additional evidence, the Appeals Council declined review, thereby rendering ALJ Connor's second decision final. *See id.* at 8-9, 327-32.

In his motion to reverse or remand, Plaintiff asserts that ALJ Connor committed four errors. *Doc. 10.* Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment. The entire record has been carefully read and considered along with the parties' well-written briefs. I incorporate herein by reference the reasoning and authorities cited in Defendant's brief, and find that Plaintiff's motion should be denied and the decision of the Commissioner affirmed. I write separately, however, to add additional observations to certain of the assertions of error.

## I.  Plaintiff's Work History And Medical Records For The Closed Period At Issue

Since this matter involves a closed period of alleged disability, below I primarily focus on the evidence in the record for the period of 1990 to 1997. Plaintiff's work record from 1989 to 1994 is sporadic and his earnings rate varies, in part due to moving back and forth between California and New Mexico. His medical records for the same period are few because, although Plaintiff took insulin throughout this period, he did not regularly visit a physician. His medical records for the closed period of February 1990 to March 1994 consist almost exclusively of emergency room visits. For the most part, Plaintiff's family and friends supplied testimony or statements regarding his limitations due to diabetes.

### A.  Work From 1985 To 1990

Plaintiff moved from California to New Mexico, apparently after a divorce. *See Record* at 115-117. He explained that the move resulted in a "drop" in his earnings for that year. *Id.* at 117.

2

When a friend in New Mexico tried to employ Plaintiff in 1985, Plaintiff declined, telling his friend that "he was a diabetic and it was difficult for him to work because the physical excertion (sic) would cause his sugar levels to go out of control, and would cause him to get dizzy and weak." *Id.* at 182 (Jerry L. Griego letter); *see also id.* at 187 (duplicate of same letter).  Plaintiff did not work in 1986.  *Id.* at 117.  However, Plaintiff did return to California in 1988 to work and, as a result, his earnings "rose" for that year.  *See id.* at 117.

When he returned to New Mexico in 1989, his earnings again "dropped." *Id.* at 117, 121. According to his sons, the decline in earnings resulted from Plaintiff quitting work in March 1989 due to diabetes-related limitations.[2]  One son moved from California to New Mexico "on March

---

[2]  In a letter, this son stated that :

> In March 1989 my dad's vision was so bad he could no longer drive, the poor circulation problems with his hands and feet was so bad he could no longer work , and he was depressed because he could not take care of himself and could not work.  We made a family decision to move him to New Mexico from California at that time because we hoped that a change in climate and a slower paced lifestyle would be beneficial for him.

> I lived with my dad and took care of him from March of 1989 through June of 1989.  He was so disabled that I did most of the cooking, cleaning, shopping, and driving.  I observed him struggle to get out of bed, bathe and get dressed.  I observed the difficulty he had in even getting up on the morning due to his extreme fatigue, muscle aches, and depression.

*Record* at 183 (David Gleason, Jr. letter styled as an affidavit and "declare[d] under penalty of perjury under the laws of the State of California," but not notarized); *see also id.* at 190-91 (duplicate of same letter).

Another son, who "worked at the same construction company" in California as his father also stated that his father "had to quit working in 3/89" and that his father was having "problems with circulation in his hands and feet, fatigue, vision problems, and depression that eventually got so bad he had to quit work."  *Id.* at 185 (Robert Gleason letter styled as an affidavit and "declare[d] under penalty of perjury under the laws of the State of Texas," but not notarized); *see also id.* at 192-93 (duplicate of same letter).

1, 1989 through June 7, 1989 to provide help and care for [his father] who was unable to work or completely care for himself due to his poor physical condition caused by Diabetes."  *Id.* at 188.

Plaintiff contends that he did work in 1990, but only for one month in January.  *Id.* at 117, 121, 145.  His application materials assert that he quit this job, *id.* at 145, 152, and became disabled on February 1, 1990 due to diabetes-related "numbness in hands [and] swelling and pain in feet" for which nothing relieved the pain, *id.* at 128; *see also id.* at 154-57.  He also asserted that his eyesight was deteriorating.  *Id.* at 151-52,160.  At some point in 1990, one of Plaintiff's sons moved to New Mexico to care for his father, but the record is unclear when this occurred. *See id.* at 52.

### B.  *Emergency Room Visits In December 1990, March 1991, January 1994*

Although Plaintiff claims not to have worked from 1990 to 1993, *see id.* at 117, 122, 145, hospital records suggest otherwise.  Although Plaintiff and his family and friends further assert that he no longer drinks, and was not drinking during the relevant period,[3] hospital records again indicate to the contrary.

In December 1990, for example, Plaintiff was admitted to the hospital after an emergency room visit for "nausea and vomiting and malaise since yesterday" and "a mild headache."  *Id.* at

---

Plaintiff's brother also stated that Plaintiff "had to quit his job in 1989 because of the physical and emotional stress on his body" and that in his opinion, his brother "couldn't work after this time due to his physical and emotional limitations, citing feet pain and coldness, bad eyesight, and depression."  *Id.* at 194 (Earl Gleason letter styled as an affidavit and "declare[d] under penalty of perjury under the laws of the State of New Mexico," but not notarized).

[3]  *See e.g., id.* at 39-41, 48, 52, 71-75 (testimony from the two hearings); *id.* at 186 (son says his father "has not had a drink since approximately 1991"); *id.* at 184 (son says his father "has not had a drink in my presence nor has he talked to me about having a drink since the early 1990's"); *id.* at 189 (ex-wife says that Plaintiff has "not abused alcohol since 1991"); *id.* at 194 (brother says that as of 2000, he "personally [has] not seen [Plaintiff] drink in over 17 years").

227.  Dr. Harlan J. Weiss treated him.  Dr. Weiss' history and examination notes provide in part that

> [Plaintiff] has been diabetic for about 9 years.  He has never been hospitalized in the past even with blood sugar of 2200 at diagnosis. he moved here from California two years ago.  He has seen Dr. Bhasker in the past but not recently.  He began to get sick yesterday and was worse last night with nausea and vomiting.  He complains of thirst and of pain in his ribs from when he has been vomiting.  He has been trying to drink diet Pepsi, water and milk, but hasn't been able to keep much down.
>
> * * * * *
>
> SOCIAL HISTORY: . . . **_He owns a gravel pit_** North of town and lives by himself.
>
> * * * * *
>
> IMPRESSION:  1. Diabetic ketoacidosis.  2. Gastroenteritis.  3. Non-compliance.  The patient indicated that he was not taking any of his insulin at all because he was afraid he was not eating to cover this and, therefore, he has worse hypogycemia and acidosis th[a]n he would have otherwise.

*Id.* at 227-28 (emphasis added).

Dr. Weiss' discharge summary states that Plaintiff's

> sugars were mostly elevated while he was getting subcutaneous insulin his last day in the hospital, but it was felt as **_he was less active than he normally is in running a gravel pit_** that it would be reasonable to watch him as outpatient before increasing any mediation other than the addition of the morning regular to his regime.

*Id.* at 226 (emphasis added).  A summary medial record notes Plaintiff's "employer" as "self employed" with the "address" as "grove pit," and the category "ins" is listed as "private pay."  *Id.* at 264.

In  March 21, 1991, Plaintiff was again admitted to the hospital following an emergency

5

room visit and again seen by Dr. Weiss.  When "closely questioned" by Dr. Weiss, Plaintiff said

that

> maybe he had the flu but he doesn't seem rather convinced of this.
> He says he has been working hard recently pouring a concrete slab.
> He has been feeling generally sick for two days.  He had nausea and
> vomiting all day yesterday but very little nausea and vomiting
> today.  He didn't take his insulin except for one dose for the last
> several days thinking his glucose was low.  He has a home glucose
> meter but did not use it.  Today a friend came over and noticed
> how sick he was and brought him to the Emergency Room where
> he was evaluated and I was called.

*Id.* at 222.  Dr. Weiss also noted that Plaintiff "***lives at a gravel pit*** north of town.  He says he has

been back here for ***about a year now*** and has been ***working odd jobs.***"  *Id.* at 222 (emphasis

added).  Dr. Weiss referred to the similar emergency room visit three months before, noted that

Plaintiff was now complaining of a headache and that "[i]nterestingly, he had a headache at his

previous admission for DKA."  *Id.* at 222.

Upon examination, Plaintiff appeared "thin, sickly, tired . . . breathing quickly . . . drawn

and ill" and dehydrated.  His blood glucose level upon admission was 1362."  *Id.* at 223.  Dr.

Weiss's plan included the notation that Plaintiff

> has severe chronic illness and due to economic factors has not been
> seen by a physician since his discharge from this facility 3 months
> ago.  This is unfortunate as it means that the patient does not get
> any medical care until he is in extremis.

*Id.* at 223; *see also id.* at 256 (noting Plaintiff unemployed and for "ins" -- "private pay").

Dr. Weiss' discharge summary indicates that when Plaintiff complained of "epigastric

pain" the day after admission, Dr. Weiss "thought that this might ***relate to the alcohol*** he had

been drinking" and also noted that Plaintiff is a "cigarette smoker and drinks coffee and this

6

increased his risk for GI problems." *Id.* at 221 (emphasis added); *see also id.* at 224 ("I suspect his abdominal pain is combination of alcohol, cigarettes & coffee").  It took Plaintiff three days before he could eat normally.  *Id.* at 221.  Dr. Weiss' discharge history states that Plaintiff "***drank three six-packs of beer while pouring a concrete slab,*** then he became generally sick with nausea and vomiting [and] didn't take his insulin except for one dose in the last several days."  *Id.* at 220 (emphasis added).  Dr. Weiss' discharge instructions requested Plaintiff to return in a week "and to ***avoid alcohol,*** caffeine, and cigarettes," but noted "[u]nfortunately, he was already smoking before he was discharged from the hospital by going outside for intermittent cigarette breaks."  *Id.* at 221 (emphasis added).

Nine months later, Plaintiff's son Robert Gleason "took care of [his] dad from December of 1991 through June of 1992 because he was to[o] ill with symptoms of his diabetes to care for himself."  *Id.* at 185; *see also id.* at 52.  He "did most everything for him from shopping and cooking to driving him to doctors' appointments."  *Id.* at 185.  Because his father could not care for his basic needs at that time and was depressed, this son did "not know how he could have worked."  *Id.* at 185.  This son also stated that his father was hospitalized in November 1993 for diabetes-related problems and that the son moved to New Mexico and lived with his father from November 1993 to May 1994 to care for him.  *Id; see also id.* at 52-53.  However, there are no medical records of any such hospitalization.

Rather, on January 29, 1994, Plaintiff was admitted to the hospital a third time for observation after a visit to the emergency room.  He was vomiting and dehydrated.  His blood sugar was out of control and, after two days observation, he was admitted to the hospital for regular care.  *Id.* at 209.  The impression was that he was suffering from "probable diabetic

7

ketoacidosis." *Id.* at 210.  The physician's consultation report notes that Plaintiff had

> not seen any physician recently and apparently has been getting his insulin over the counter for the last several years.  He has a history of diabetic ketoacidosis in the past.  He has been taking 50 units of NPH insulin daily without any type of monitoring. He was in his usual state of health until several days [ago] when he developed a cough.  Since then he has developed abdominal pain, blurry vision, intermittent productive cough, and rapid respirations. ***He is a heavy drinker, last had over a six pack a couple of days ago.***  He has had no chest pain.
>
> \* \* \* \* \*
>
> SOCIAL HISTORY:  He has been living with his children.  He is divorced.  he is a carpenter. ***Often drinks over a six pack a day*** and smokes 1 ½ packs a day.
>
> \* \* \* \* \*
>
> DISCUSSION:  Non-compliant diabetic with DKA triggered by recent respiratory infection awaiting results of chest x-ray to rule out pneumonia because of his extreme metabolic acidosis he will begin on . . . .  He needs to be monitored for alcohol withdrawal and ***will be given Serax if he develops any withdrawal symptoms.*** . . .
>
> In the long run, his psychosocial problems need to be address[ed].  He needs regular medical follow-up and ***needs intervention for alcohol and tobacco abuse.***

*Id.* at 213-15 (emphasis added).

During this stay in the hospital, a therapist noted that ***Plaintiff "said*** (alcohol) drinking is not a problem for him because ***he drinks 2-3 beers a couple of times per week*** that he use to be a heavy drinker 11 years ago and that he can quite (sic) any time he wants.  He considers smoking his problem." *Id.* at 217 (emphasis added).  She recommended, among other things, that Plaintiff be "encourage[d] to apply for SSI." *Id.*   As of a few days later, he was "doing well, improving," "feel[ing] better," "very much wants to go home." *See id.* at 211, 212.  Upper GI series showed

8

some mild gastritis.  *Id.* at 241.  Chest ex-rays unremarkable.  *See id.* at 251.

At some time in 1994, Plaintiff attempted to work again, but again only worked for about one month.  *Id.* at 117; *see also id.* at 122.  On September 26, 1994, he went to the emergency room concerned that there was a piece of steel in his eye.  *Id.* at 207-08.  On October 27, 1994, Plaintiff visited a doctor for a lesion on the bottom of his foot and a rash around his ankle.  He claimed to be "in good control" of his diabetes at that point, saying that his "sugars are running in the 120 to 180 range," but he did not have "enough money to have a full evaluation of his diabetes today.  He has not followed up since being in the hospital for DKA months ago."  *Id.* at 290.  The doctor checked his random glucose, *id.* at 290, and it apparently registered at 400, *see id.* at 291 (partially legible post-it-note).  As of April 1997, an emergency room record states Plaintiff "works as a carpenter."  *Id.* at 205.

## II.  ALJ Connor's Decision

Following remand, ALJ Connor issued a comprehensive decision that detailed all of the evidence and testimony and focused on the closed period at issue.  She found Plaintiff and his friends and family not fully credible regarding his condition and limitations during that time frame.[4]  Ultimately, she concluded that "the real precipitating and aggravating factors affecting

---

[4]    The lay statements in this case have been provided by friends and family of the claimant.  In essence, these statements testify to the observations of these people that the claimant has been very ill and was in need of care from time to time during the period under review (Exhibit 11E).  None of these individuals indicate that they were familiar with the requirements of the claimant's daily medical regimen, or whether he was complying with prescribed treatments.  No one indicated that he could not afford treatment or medications.  One of his sons stated that his father was hospitalized in a coma because of a reaction to insulin.  However, the evidence establishes that the claimant was hospitalized for severe ketoacidosis because of his failure to take his insulin.  Their statements that no one of them was aware that he was abusing alcohol are not helpful in the face of

[his] condition [during the relevant period] have been his noncompliance and alcohol abuse." *Id.*
at 21, *see also id.* at 18-21.  She issued a detailed residual functional capacity analysis, which
provided in relevant part:

> Prior to and as of the date he last held insured status, the claimant
> retained a residual functional capacity which supported light work.
> Nonexertional factors did not significantly erode this work capacity.
> While his more recent medical records indicate that his condition
> has deteriorated and he has had onset of neuropathy and
> retinopathy associated with his uncontrolled diabetes, his records
> do not indicate that he experience such complications due to his
> diabetes prior to March 31, 1994. . . .
>
> . . . I note that no treating doctor indicated that the claimant was
> unable to work, or that he experienced any particular work related
> functional restrictions from February 1, 1990 through March 31,
> 1994.  His current doctor states that she can not give an opinion as
> to whether his condition was disabling prior to 1997 (Exhibit 13F).[5]
> The medical consultant gave his opinion only that the evidence
> prior to March 31, 1994 did not support a finding of disability
> (Exhibit 4F).  He did not indicate any particular functional
> restrictions during the period under review.[6]   In the present case,

> evidence that he was severely abusing alcohol during that period.  The
> letters overall indicate that the claimant's friends and family provided
> sympathetic help based on the claimant's representations to them,
> representations which I do not find fully credible, but no evidence that
> these individuals were knowledgeable about his medial condition, his
> noncompliance with prescribed treatments, or his abuse of alcohol.  As
> such, these lay statements are of very limited help to me in my evaluation
> of the claimant's capacities for work activities.  They do not enhance his
> credibility, and they are accorded little weight herein.

*Record* at 20; *see also id.* at 19 (assessment of Plaintiff's credibility).

[5]  Dr. Audrey M. Vega stated that she believed Plaintiff's diabetes was in poor control before
1994, but that "[i]t is unknown if his complications, i.e., his diabetic neuropathy, were actually debilitating
since I did not actually establish with this patient until July of 1997."  *Record* at 318.

[6]  I believe the citation to Exhibit 4F is a typographical error and that ALJ Connor probably meant
to cite Exhibit 3F.  *See Record* at 267.  In any event, the ALJ's characterization  is consistent with all of
the medical consultants' findings.  *See id.* at 77, 78, 268-75.

since no doctor has indicated any restrictions on the claimant's activities, I turn to other sources of evidence which might provide some insight into the claimant's capacities during the period under review.  I note that the claimant's reports to his doctor during the period under review indicate that he was performing light work activities running a gravel pit in 1990 (Exhibit 1F), and that his friend testified that the claimant's mother owned a gravel pit.[7] Evaluation of the claimant's credibility pursuant to SSR 96-7p reveals that he has been less than fully credible in his complaint of symptoms and functional difficulties and that his behavior was inconsistent with his allegations.  I do not find evidence pursuant to SSR 96-7p that the claimant's symptoms limited his ability to lift 20 pounds occasionally, or to stand and walk for two hours at a time, for as much as six hours of out of an eight hour workday, with the customary rest breaks and a meal break.

My findings of the claimant's residual functional capacity above take into consideration the effects of his alcohol abuse during the period under review.  No doctor stated that he experienced significant work related problems due to his drinking habits at the time, nor has the claimant stated that his drinking created functional problems.  There is no evidence that the claimant's drinking caused any work related functional restrictions or eroded his capacity to perform light work during the period under review.

*Id.* at 21-22.

### III.  Analysis:  Plaintiff's Related Claims Of Error Are Unavailing

If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and Plaintiff is not entitled to relief.  *E.g., Hamilton v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1497-1500 (10th Cir. 1992).  My assessment is based on a review of the entire record, where I can neither reweigh the evidence nor substitute my judgment for that of the agency.  *E.g., Casias v. Sec'y of Health & Human Servs.,* 933 F.2d

---

[7]  *See Record* at 50 (in response to ALJ's question whether Plaintiff's friend Mr. Greigo was aware of "evidence that he was running a gravel pit in December of 1990," he replied:  "No.  He doesn't run a gravel pit.  His mother owns a large gravel pit in the area where he was residing.").

799, 800 (10th Cir. 1991).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Castellano v. Sec'y of Health & Human Servs.,* 26 F.3d 1027, 1028 (10th Cir. 1994) (internal quotations and citations omitted).  "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence."  *O'Dell v. Shalala,* 44 F.3d 855, 858 (10th Cir. 1994) (citation omitted).

Plaintiff first argues that, because he has been afflicted with diabetes for a long time but has few medical records from the relevant period, Social Security Ruling 83-20 required ALJ Connor to call a medical advisor to assist in inferring when Plaintiff's disability began.  *See Doc. 11* at 9-11.  I am not persuaded.

As I understand the argument, Plaintiff contends that ALJ Connor could not decide whether the evidence showed Plaintiff was disabled, without first asking a medical advisor to infer when disabling conditions from diabetes initially arose.  As I read Ruling 83-20, however, the necessity of calling a medical expert does not arise until there is a determination that a claimant is in fact disabled.  The introduction to the Ruling, for example, states:  "***In addition to determining that an individual is disabled,*** the decisionmaker must also establish the onset date of disability."  *Social Security Ruling 83-20,* 1983 WL 31249 at *1.  Plaintiff's position thus puts the cart before the horse.  A number of courts have so held, including the Tenth Circuit.[8]

---

[8]  *See, e.g., Webb v. Secy' Health & Human Servs.,* 1994 WL 50459 at *2 (10th Cir. 1994) (affirming decision from this court) ("The policy statement accompanying Ruling 83-20 defines an onset date as 'the first day an individual is disabled as defined in the Act and the regulations.'  S.S.R. 83-20.  Thus, the onset date relates to the date of disability.  Here, the ALJ determined Mr. Webb did not have a severe impairment.  Substantial evidence supports that conclusion.  Consequently, we do not reach the question of when any disability started.  Without a severe impairment, there can be no disability.  The ruling does not apply."); *see also e.g., Baladi v. Barnhart,* 33 Fed. Appx. 562, 564 (2nd Cir. 2002) ("Plaintiff also argues that the Commissioner failed to apply Social Security Ruling (SSR) 83-20, which requires that the Commissioner determine disability onset date based on specific medical evidence.

The issue before ALJ Connor was not when Plaintiff's diabetic condition began, but when the severity of his diabetes-related symptoms precluded him from working at any job. The fact that Plaintiff is awarded benefits commencing at a later date than the alleged onset is not controlling of whether a medical expert should be called under Ruling 83-20.[9] Also, it would be improper to use a Ruling 83-20 medical expert to supply a retrospective (and hypothetical)

_____

However, SSR 83-20 is inapplicable to the decision under review, because the ALJ's determination that plaintiff was not disabled obviated the duty under SSR 83-20 to determine an onset date."); *Blake v. Massanari,* 2001 WL 530697 at *10 (S.D. Ala. 2001) ("If the ALJ correctly determines that a person was not disabled prior to the expiration of their insured status and that decision is supported by substantial evidence and proper application of the law, and the Appeals Council review of that decision is proper, then there is no obligation on the part of the ALJ or the Appeals Council to infer a remote onset date of disability because there is no disability. In the present case, the plaintiff did not meet her burden of proving that she is disabled. Therefore, there is no requirement that the Appeals Council apply SSR 83-20 to its consideration of the record.").

[9] *See Ray v. Apfel,* 2000 WL 342483 at *2 (10th Cir. 2000) ("'[T]he date alleged by the individual should be used if it is consistent with all the evidence available. . . . However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record.' SSR 83-20, 1983 WL 31249, at *3. Most of the medical records submitted in this case relate to Ms. Ray's physical condition. The first indication of a mental impairment is a September 14, 1994 psychiatric review technique form, prepared at the state level, finding a mild affective mood disorder. [Court reviews substance of later medical records]. Thus, the medical evidence is inconsistent with the June 17, 1994 onset date proposed by Ms. Ray and clearly supportive of the October 27, 1995 date selected by the ALJ. Before the beginning of treatment, there was evidence of mild to moderate depression, but not a mental impairment that kept Ms. Ray from working. We conclude that the ALJ applied the correct legal standard in establishing the disability onset date."); *James v. Chater,* 96 F.3d 1341, 1343 (10th Cir. 1996) (involving case from this district) ("plaintiff complains of noncompliance with Social Security Ruling 83-20, because the ALJ did not call a medical advisor to testify regarding onset of disability, specifically with respect to psychological impairment. This argument is frivolous. The cited ruling indicates that such testimony is necessary when the issue is whether 'the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination.' . . . Here, there were pertinent examinations both before and after the alleged onset date. Third, we emphasize that there is no problematic inconsistency between the denial of DIB in this case and the award of supplemental security income (SSI) to plaintiff commencing March 14, 1989, in a separate proceeding. Quite apart from the time disparity involved, the two decisions turn on significantly different step-four analyses"), *overruled on other grounds by decision in Sims v. Apfel,* 530 U.S. 103 (2000).

13

diagnosis, simply because medical evidence may be lacking.[10]  Indeed, Plaintiff's own treating physician could not issue an opinion on the subject.

Instead, the first issue to address is whether the substantial evidence supports ALJ Connor's residual functional capacity finding,[11] which is Plaintiff's second assertion of error. Plaintiff asserts error focusing almost exclusively on the medical evidence of his disability some

---

[10]  *Compare Adame v. Apfel,* 4 Fed. Appx. 730, 734-35 (10th Cir. 2001) ("The *Reid* [*v. Chater,* 71 F.3d 372 (10th Cir. 1995)] court recognized that it was sometimes necessary 'to infer the onset date,' and in that event, the ALJ should obtain the opinion of a medical expert at the hearing. . . .  'However, a medical advisor need be called only if the medical evidence of onset is ambiguous.' . . . ***Here, the medical evidence is not ambiguous, it is just nonexistent.***  Therefore, considering that a medical expert would be required to review the evidence and render a retroactive opinion, he or she could do nothing more than infer that because prior to September 30, 1988, Mr. Adame suffered from drug addiction and had trouble holding a job, and because in 1993 he exhibited the symptoms of severe PTSD, he must have had PTSD prior to September 30, 1988.  Even if this inference could be accepted as true, it still does not answer the question of whether Mr. Adame's PTSD was disabling prior to September 30, 1988.") (emphasis added); *with Ott v. Chater,* 1997 WL 26575 (10th Cir. 1997) ("Here, the record reflects that claimant has not engaged in substantial gainful activity since December 31, 1988.  ***There are no medical records for the relevant time period prior to claimant's date last insured of December 31, 1989.***  The January 1990 medical records, as well as other, later medical reports, indicate that claimant may have been disabled by post-traumatic stress syndrome prior to December 31, 1989.  Accordingly, it was necessary to infer the onset date.") (emphasis added).

[11]  *See e.g., Adams v. Apfel,* 1998 WL 717271 at *2 (10th Cir. 1998) ("Social Security Ruling 83-20, 1983 WL 31249, recognizes that an ALJ sometimes may need to obtain the services of a medical advisor to infer a disability onset date.  *See Reid v. Chater,* 71 F.3d 372, 374 (10th Cir. 1995).  'However, a medical advisor need be called only if the medical evidence of onset is ambiguous.'  *Id.*  Here, there was no ambiguity.  The medical evidence established that plaintiff could perform work through the date of expiration of his insured status.  We conclude the ALJ did not err in failing to call a medical advisor."); *Lawson v. Chater,* 1996 WL 21260 at **1-2 (10th Cir. 1996) ("medical evidence of record, coupled with claimant's work history suggest an onset date much later than April 1985.  It was not until an examination by his treating physician on January 28, 1991, that any doctor limited claimant's work-related activities. . . . Dr. D'Angelo was of the opinion that claimant could do only sedentary work. . . .  Based on this opinion, the ALJ determined claimant's disability onset date to be January 28, 1991.
Claimant contends that the ALJ should have called a medical advisor to assist in establishing the onset date. The ALJ, however, is not obliged to call a medical advisor 'in every case where the onset of disability must be inferred.'  *Bailey v. Chater,* 68 F.3d 75, 79 (4th Cir. 1995).  Only if the medical evidence is ambiguous must the ALJ consult a medical advisor.  *Reid v. Chater,* 71 F.3d 372, 374 (10th Cir.1995)."); *Brown v. Chater,* 1995 WL 490275 at *1 (10th Cir. 1995) ("Because the ALJ's determination of no disability before August 10, 1990, is supported by substantial evidence, it follows that no disability existed on the earlier date either.").

14

three years after the closed period at issue.  *See Doc. 11* at 13, 15 (citing *Record* at 266, 267, 269, 271); *Doc. 15* at 2 (citing *Record* at 281, 287).  In essence, he argues that because these records show that he was disabled in 1997 and there is lay testimony about the same disabling conditions for the period at issue, ALJ Connor should have inferred that Plaintiff was also disabled as of 1994 at the latest.  *See Docs. 11, 15.*

However, Plaintiff takes no issue with the ALJ's credibility determination concerning Plaintiff's assertions of his limitations and those of his family and friends.  Furthermore, he disregards the medical evidence during the relevant period, discussed above, that ALJ Connor considered in arriving at her decision.  It constitutes substantial evidence for her conclusion that "[p]rior to and as of the date he last held insured status, the claimant retained a residual functional capacity which supported light work.  Nonexertional factors did not significantly erode this work capacity."  *Record* at 21.  Consequently, Plaintiff's claims of error in her residual functional capacity analysis and subsequent application of the Grids are unavailing.

I find Plaintiff's assertion that ALJ Connor "labeled" him as an alcoholic yet failed to perform the proper analysis under 20 C.F.R. § 404.1535(b)(2) is misplaced.  That regulation, like Ruling 83-20, does not apply unless the Administration "find[s] that [the claimant] *is disabled*."  20 C.F.R. § 404.1535(a) (emphasis added).  ALJ Connor specifically noted that since she did not find Plaintiff disabled "even considering the ramifications of his medical noncompliance, 20 CFR 404/1530 is not applicable."  *Record* at 19.

Wherefore,

**IT IS HEREBY ORDERED** that Plaintiff's motion *(Doc. 10)* is DENIED, and the

decision of the Commissioner is affirmed.  A final order will enter concurrently herewith.

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by consent.

16